# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| United States of America, | Case No. 13-cr-0040 (DWF/JJG) |
| **Plaintiff,** | |
| v. | **REPORT AND RECOMMENDATION** |
| Michael Scott Luedtke (01), Edward McCabe Robinson (02), and Irah Lee Goodwin (03), | |
| **Defendants.** | |

_____

JEANNE J. GRAHAM, United States Magistrate Judge

This case came before the undersigned United States Magistrate Judge for a pretrial motion hearing on April 23, 2013. Thomas M. Hollenhorst appeared on behalf of the United States of America. Robert D. Richman appeared on behalf of Michael Scott Luedtke ("Luedtke"). Andrew H. Mohring appeared on behalf of Edward McCabe Robinson ("Robinson"). Matthew D. Forsgren appeared on behalf of Irah Lee Goodwin ("Goodwin"). The case was referred to this Court pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a)(3) to conduct a hearing and submit a report and recommendation to the Honorable Donovan W. Frank, United States District Judge. Trial in this matter is set to begin on July 15, 2013.

Currently pending before the Court are Robinson's Motion to Suppress February 8, 2013 Statements, Admissions, and Answers (ECF No. 47); Luedtke's Motion to Suppress Statements, Admissions, and Answers (ECF No. 55); Luedtke's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 56); Luedtke's Motion to Dismiss for Lack of

Jurisdiction (ECF No. 57); Goodwin's Motion to Suppress Statements (ECF No. 60); Goodwin's Motion to Suppress Physical Evidence (ECF No. 61); Goodwin's Motion to Sever Defendant (ECF No. 70); Robinson's Motion to Dismiss for Lack of Jurisdiction (ECF No. 82); and Goodwin's Motion to Dismiss (ECF No. 83).

## I.     Procedural Background

An Indictment was filed against Luedtke, Robinson, and Goodwin on March 4, 2013. (ECF No. 1.) Each Defendant is charged with one count of conspiracy to assault employees of the Sherburne County Sheriff's Office, while those employees were assisting federal officers and employees and while the employees were performing their official duties, in violation of 18 U.S.C. §§ 111(a), 111(b), and 371. Each Defendant is also charged with assault on Sherburne County Sheriff's Office Corrections Officers Jesse Patrick Kipka ("Kipka") and Jesse Jay Overlie ("Overlie"), while Kipka and Overlie were assisting federal officers and while they were performing their official duties, in violation of 18 U.S.C. §§ 111(a) and 111(b). The alleged assaults occurred on February 8, 2013, when Defendants were housed at the Sherburne County Jail pursuant to an Intergovernmental Service Agreement between the United States Marshals Service ("USMS") and the jail.

This Court held a pretrial motion hearing on April 23, 2013, at which the following individuals testified: Deputy United States Marshal Farris Wooton, Sherburne County Jail Corrections Officer Jessica Reischl ("Reischl"), Sherburne County Jail Corrections Officer Joshua Hover ("Hover"), and Sherburne County Jail Corrections Officer John Reich ("Reich"). In addition, the following exhibits were admitted into evidence:

- Gov't Ex. 1: Intergovernmental Service Agreement for the Housing of Federal Prisoners, dated June 1, 1997

- Gov't Ex. 2: USMS Policy Directive 9.2

- Gov't Ex. 3: USMS Policy Directive 9.22

- Gov't Ex. 4: USMS Policy Directive 9.23

- Gov't Ex. 5: USMS Policy Directive 9.24

- Gov't Ex. 6: Position Description–Sherburne County Sheriff's Office Corrections Officer

- Gov't Ex. 7: Kipka Pay Statement

- Gov't Ex. 8: Overlie Pay Statement

At the conclusion of the motion hearing, Defendants asked for an opportunity to file additional motions and written memoranda. The Court granted that request in an Order dated April 25, 2013, and set a deadline of May 22, 2013, for all parties to file any additional motions or memoranda. Robinson and Goodwin each filed a motion to dismiss; Robinson, Goodwin, and Luedtke jointly filed a memorandum in support of their motions to dismiss; and Luedtke filed a memorandum in support of his motion to suppress statements. The Government filed its memorandum on May 23, 2013, after asking for and receiving a one-day extension. The Court took all motions under advisement at that time.

## II. Robinson's Motion to Suppress February 8, 2013 Statements

On February 8, 2013, Reischl was on duty at the Sherburne County Jail. (Mots. Hr'g Tr. 61:8-10, Apr. 23, 2013, ECF No. 88.) At approximately 3:45 p.m., Reischl went to the Special Housing Unit ("SHU") to escort Robinson back into the general population in the Gamma Unit. (Mots. Hr'g Tr. 61:11-19.) As Reischl walked with Robinson to the Gamma Unit, Robinson said goodbye to one of the SHU corrections officers and said, "I'll be back." (Mots. Hr'g Tr. 61:19-22.) Reischl said, "Don't say that." (Mots. Hr'g Tr. 61:22-23.) As Reischl and Robinson walked through the Gamma Unit door, Robinson asked her, "Where's Luedtke?" (Mots. Hr'g Tr. 63:10-11.)

Overlie and Kipka were assigned to supervise the inmate population in the Gamma Unit on February 8, 2013. (Mots. Hr'g Tr. 25:12-17.) Video surveillance of the area in which they were working shows Robinson and Goodwin approach Overlie and Kipka and attempt to wrap a shirt around Overlie, but Overlie escapes their grasp and runs. (Mots. Hr'g Tr. 26:16-21.) The video also shows Luedtke approach Kipka, strike him in the back of the head, and knock him to the ground. (Mots. Hr'g Tr. 26:21-23.) Kipka is also sprayed with his own can of mace, struck in the head with the can of mace, and hit in the leg with an office chair. (Mots. Hr'g Tr. 27:1-4.)

Hover was one of the first corrections officers to respond to the incident. (Mots. Hr'g Tr. 100:12-13.) He saw Robinson and told him to get on the ground. (Mots. Hr'g Tr. 100:15-16.) Just before Hover handcuffed Robinson, he heard Robinson say, "I'm good. It's over. I did what I had to do." (Mots. Hr'g Tr. 100:19-22.) No one had asked Robinson any questions or made any comments to him before his statement to Hover. (Mots. Hr'g Tr. 102:6-8.)

Reich also had contact with Robinson after the alleged assault. As Robinson was being escorted from the Gamma Unit to the Booking Unit, he looked at Overlie and said, "Overlie, why did you run, you little bitch?" (Mots. Hr'g Tr. 118:24-25, 120:1-2.) No one had asked Robinson any questions or made any comments to him before his question to Overlie. (Mots. Hr'g Tr. 119:20-24.)

The Government cannot use at trial a defendant's statement to a law enforcement officer made pursuant to interrogation in a custodial setting unless the officer first advised the defendant of certain rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Statements made voluntarily, "that are not the product of any interrogation by the police," by a person in custody are an exception to the exclusionary rule. *United States v. Waloke*, 962 F.2d 824, 829 (8th Cir. 1992) (citing *Rhode Island v. Innis*, 446 U.S. 291, 299-301 (1980)); *see also Miranda*, 384 U.S. at 478

("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). "Interrogation," as contemplated by *Miranda*, can be "either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300-01. The latter standard incorporates an officer's words or actions, other than those normally incident to custody, which the officer "should know are reasonably likely to result in an incriminating response." *Id.* at 301.

The Court finds that none of Robinson's statements were the product of interrogation or its functional equivalent. The statements were purely voluntary. As such, Robinson's motion to suppress statements should be denied.

### III.     Goodwin's Motion to Suppress Statements

Reischl also responded to the alleged assault at the Sherburne County Jail on February 8, 2013. After hearing from Overlie that Goodwin was one of the perpetrators, Reischl handcuffed Goodwin, and Goodwin said, "Jess, I had nothing to do with it." (Mots. Hr'g Tr. 65:9-10, 18-20.) Reischl had not asked Goodwin any questions or made any comments prior to his statement. After the statement, Reischl told Goodwin that she and the other corrections officers needed to sort things out and secure the area. (Mots. Hr'g Tr. 65:12-15.) Reischl then left the Gamma Unit and escorted Luedtke to the Booking Unit. (Mots. Hr'g Tr. 66:11-12.) When Reischl returned to the Gamma Unit, Goodwin said, "Remember what I told you in Booking?" (Mots. Hr'g Tr. 68:10-11.) Reischl thought Goodwin was referring to another statement he had made on December 7, 2012. (Mots. Hr'g Tr. 69:4-10.)

On December 7, 2012, Goodwin allegedly threatened Overlie and was taken to a cell in the Booking Unit. (Mots. Hr'g Tr. 69:4-5, 19.) Corrections officers at the Sherburne County Jail perform welfare, or wellbeing, checks on inmates in the Booking Unit every fifteen minutes. (Mots. Hr'g Tr. 96:19-23.) When Reischl was checking on Goodwin, he asked her for a blanket.

(Mots. Hr'g Tr. 69:22-23.) Reischl then asked Goodwin what had happened, and to the best of her recollection, Goodwin said, "I'm going to kick that dude's ass." (Mots. Hr'g Tr. 69: 23-24, 70:1-2.) Reischl said, "You can't say that. Don't say that." (Mots. Hr'g Tr. 70:2-3.) Given the context of the discussion, Reischl believed Goodwin was referring to Overlie. (Mots. Hr'g Tr. 70:5-6.) At the time, Goodwin was secured in a cell, but not handcuffed, and no other corrections officers were present. (Mots. Hr'g Tr. 96:14-16, 97:4-6.)

Reischl testified that her main duty as a corrections officer is to maintain the safety and security of the Sherburne County Jail. (Mots. Hr'g Tr. 59:7-10.) She frequently asks questions to inmates to determine their mental state and whether they might pose a risk to themselves or others, especially after an incident. (Mots. Hr'g Tr. 59:16-25, 60:1-4.) A separate team of investigators is responsible for investigating incidents at the jail. (Mots. Hr'g Tr. 60:5-7.) Inmates routinely refer to Reischl as "Jess." (Mots. Hr'g Tr. 84:15-17.) Reischl has known Goodwin since the beginning of his detention there, and she did not consider him dangerous. (Mots. Hr'g Tr. 90:20-25, 91:1.)

With respect to the two statements Goodwin made on February 8, 2013, the Court finds the statements were not the product of interrogation or its functional equivalent. The statements were purely voluntary and thus should not be suppressed.

As to the December 7, 2012 statement, it is not clear whether Goodwin is actually seeking to suppress this statement. He did not include the statement in his original motion papers; he did not present oral argument at the hearing concerning suppression of the statement; and he did not submit a post-hearing memorandum on the issue. However, in an abundance of caution, the Court will briefly discuss the issue.

The Court finds that Goodwin made the December 7, 2012 comment in response to Reischl's question about what had happened. Thus, the interrogation component is satisfied. The Court therefore proceeds to the question of Goodwin's custodial status.

Incarceration does not necessarily render an interrogation custodial. *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988); *see Howes v. Fields*, 132 S. Ct. 1181, 1191 (2012). The Supreme Court has offered three justifications for this rule. First, for an individual in jail, "the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same 'inherently compelling pressures' that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station." *Howes*, 132 S. Ct. at 1191. Second, an inmate is not likely to be pressured into speaking by the hope that he will be released after the interrogation. *Id.* Third, given a prisoner's familiarity with the criminal justice system, he should know that his interrogators "probably lack the authority to affect the duration of his sentence." *Id.*

The Court must consider Goodwin's subjective belief that his freedom of action was constrained to a degree commensurate with formal arrest and whether such a belief was objectively reasonable. *United States v. Chamberlain*, 163 F.3d 499, 503 (8th Cir. 1998) (quoting *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990)). Factors to guide the Court include

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349.

In the present case, Reischl did not inform Goodwin that questioning was voluntary, that he could choose not to answer, that he could leave, or that he was not under arrest. Thus, the first factor weighs in favor of custody.

Next, Goodwin was secured in a cell in the Booking Unit, having been taken there after allegedly threatening a corrections officer. An increase in the level of confinement indicates that an inmate is in custody, *see Chamberlain*, 163 F.3d at 504, and common sense dictates that putting a prisoner in a different cell after an incident is an increase in the level of confinement. On the other hand, the record does not indicate that the Booking Unit cell was any different than a regular cell, and Goodwin was not handcuffed or otherwise restrained inside the cell. *Cf. United States v. Thomas*, Crim. No. 12-128 (MJD/JJK), 2012 WL 6812536, at *5 (D. Minn. Dec. 19, 2012) (where inmate was handcuffed behind her back, held by the arm, and led down a hall, finding her restrained as if under formal arrest.) On balance, while the second factor tips in favor of custody, it does not tip heavily enough to be dispositive of the analysis.

Third, Goodwin did not initiate contact with Reischl, and Reischl did not make an official request to Goodwin to answer questions. However, Goodwin initiated the conversation with Reischl by asking for a blanket and then willingly answered Reischl's question, indicating his acquiescence to it. Thus, the third factor is neutral.

Moving to the final three factors, Reischl did not use any strong-arm tactics or deceptive stratagems. Reischl was the only corrections officer present, and she did not dominate the surroundings or conversation. Indeed, Reischl's purpose for going to Goodwin's cell was to check on his wellbeing. The fourth and fifth factors therefore do not favor custody. Finally, the

record does not reflect whether Goodwin was arrested or disciplined for the alleged threats against Overlie, so the final factor is neutral.

The *Griffin* factors are not exhaustive, and a court should consider all of the circumstances in forming its determination. *Griffin*, 922 F.2d at 1349. Here, the record before the Court also includes evidence that Reischl's main duty as a corrections officer was to maintain the safety and security of the jail, including performing wellbeing checks on inmates and ascertaining their mental state. While Reischl's question to Goodwin was investigatory in nature, her original purpose in going to his cell was to check on his welfare. This was the context in which the interrogation occurred. In addition, Reischl is not a law enforcement officer or investigator. Reischl and Goodwin have known each other since Goodwin arrived at the jail, and it is reasonable to infer that Goodwin considered Reischl someone who maintained the safety and security of the jail, not as a jail investigator or law enforcement officer. The context of the question and Reischl's status as a corrections officer, rather than an investigator, weigh against a subjective belief by Goodwin that he was under the equivalent of a formal arrest.

It is also reasonable to infer from Reischl's testimony that she had a good relationship with Goodwin, and he presumably referred to Reischl informally by her first name, "Jess," as the other inmates did. Goodwin's use of this informal address and casual conversational tone are not consistent with a subjective belief that he was restrained as though under formal arrest.

Nothing in the record renders Goodwin's subjective belief objectively reasonable. Indeed, the context of the question, Reischl's status and duties as a corrections officer, and Goodwin's cordial and informal treatment of Reischl are all consistent with such a belief.

Accordingly, having carefully examined the particular facts and circumstances surrounding Goodwin's December 7, 2012 statement, the Court concludes that Goodwin was not

in custody when Reischl asked him what happened. The Court further concludes that the statement was made voluntarily and should not be suppressed.

## IV.    Luedtke's Motion to Suppress Statements

The Government represented in its post-hearing memorandum that it would not use Luedtke's statements in its case-in-chief. (Gov't Mem. Response to Defs.' Mots. at 7, ECF No. 89.) Accordingly, Luedtke's motion to suppress statements is moot and should be denied as moot.

## V.    Luedtke's and Goodwin's Motions to Suppress Evidence

Luedtke and Goodwin originally moved to suppress any evidence seized pursuant to a search warrant or warrantless search. However, Luedtke and Goodwin never identified any seized evidence, search warrants, or warrantless searches, nor did Luedtke or Goodwin submit any legal argument for suppression. The Court therefore recommends that the motions to suppress evidence be denied as moot.

## VI.    Goodwin's Motion to Sever Defendant

Goodwin moves for a separate trial on the ground of prejudice, pursuant to Federal Rule of Criminal Procedure 14.

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). A defendant seeking to sever his trial must show that a joint trial would cause "real prejudice." *United States v. Mickelson*, 378 F.3d 810, 817-18 (8th Cir. 2004). "Real prejudice" exists when "(a) his defense is irreconcilable with that of his co-defendant or (b) the

jury will be unable to compartmentalize the evidence as it relates to the separate defendants." *Id.* at 818.

The only prejudice identified by Goodwin in his memorandum is the possibility "that irreconcilable defenses may very well develop in this case." (Goodwin's Mem. Supp. Mot. Severance at 4, ECF No. 71.) Goodwin has alleged only a general possibility of prejudice, not real prejudice. He has not demonstrated that his defense actually is irreconcilable with his co-Defendants or that the jury could not sort through the evidence relevant to each Defendant. Furthermore, even if Goodwin had shown a risk of real prejudice, he has not shown that the preferred remedy of jury instructions would be inadequate. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993).

At the hearing, Goodwin expressed concern that a *Bruton* issue could arise in connection with a letter Luedtke allegedly wrote, in which Luedtke allegedly said that he and two other men had beaten two corrections officers. The Government assured Goodwin there would be no *Bruton* issue and represented it would forego using the evidence at trial rather than risk an unfair trial. Based on the Government's representation, the Court anticipates no *Bruton* issue at this time.

Because Goodwin has not demonstrated any real prejudice likely to occur from a joint trial, the Court recommends that his motion for severance be denied.

**VII.    Robinson's, Luedtke's, and Goodwin's Motions to Dismiss the Indictment**

Robinson, Luedtke, and Goodwin move to dismiss the Indictment on jurisdictional and constitutional grounds. They argue that Sherburne County Jail Corrections Officers Overlie and Kipka were neither federal employees nor assisting federal employees, and thus, federal jurisdiction is lacking. Defendants also challenge 18 U.S.C. § 1114 as vague and overbroad.

**A.      Jurisdiction**

Defendants are charged with violating 18 U.S.C. § 111(a)(1), which makes it a crime to assault "any person designated in section 1114 of this title while engaged in or on account of the performance of official duties." Section 1114, in turn, protects "any officer or employee of the United States or of any agency in any branch of the United States Government . . . or any person assisting such an officer or employee in the performance of such duties or on account of that assistance." 18 U.S.C. § 1114. Prior to its amendment in 1996, § 1114 included a long list of federal employees and functions, but the amendment replaced the list with a more general definition. *See United States v. Roy*, 408 F.3d 484, 489 n.2 (8th Cir. 2005).

Whether an individual in Overlie and Kipka's position—that is, a corrections officer with the Sherburne County Jail—qualifies as a federal officer or employee, or as a person assisting a federal officer or employee, "is a 'threshold legal question' for the court." *See Roy*, 408 F.3d at 489 (quoting *United States v. Bettelyoun*, 16 F.3d 850, 853 (8th Cir. 1994)); *see also United States v. Drapeau*, 644 F.3d 646, 653 (8th Cir. 2011) (whether Bureau of Indian Affairs officer "was a federal officer within the meaning of § 111 was a question of law for the court."). Whether Overlie and Kipka were such officers, "as well as whether [they were] engaged in official duties at the time of the incident, are questions of fact for the jury." *See Roy*, 408 F.3d at 489; *see also Drapeau*, 644 F.3d at 653 (whether Bureau of Indian Affairs officer was acting as a federal officer and performing federal functions were questions for the jury). Thus, at this time, the Court is concerned only with the first question: whether a corrections officer with the Sherburne County Jail qualifies as a federal officer or employee or a person assisting a federal officer or employee. This threshold question may be answered by examining statutory authority and the contract under which the authority was delegated. *Roy*, 408 F.3d at 490.

In *Roy*, the threshold question before the Eighth Circuit was whether an officer of the Flandreau City Police Department and Flandreau Santee Sioux Tribal Police Department qualified as a federal officer for the purposes of § 111(a) and § 1114. *Id.* at 489. The court did not analyze whether the officer *assisted* a federal officer, but whether the officer was a *de facto* federal officer. In this respect, the issue in *Roy* differs from the issue presently before the Court, but the threshold question is sufficiently analogous to provide a framework for this Court.

In answering the threshold legal question, the Eighth Circuit considered the language of the statute that authorized the Secretary of the Interior to provide or assist in providing law enforcement services on Indian lands. *Id.* The statutory language permitted the Secretary to enter into agreements for the use of non-federal personnel and facilities to carry out law enforcement services. *Id.* The court also considered the terms of an agreement between the Secretary and the Flandreau Santee Sioux Tribe for law enforcement services. *Id.* at 490. One of the contract's express purposes was to authorize the Flandreau Police Department to provide services on lands under the jurisdiction of the Flandreau Santee Sioux Tribe. *Id.* In examining the threshold question, the Eighth Circuit considered whether the contract, "taking into account the manner in which it delegates the Bureau's law enforcement authority, is sufficient to authorize officers of the Flandreau City Police Department to exercise the Bureau's law enforcement functions under" the authorizing statute. *Id.* Even though the agreement did not expressly delegate the Bureau of Indian Affairs' law enforcement functions to the Flandreau Santee Sioux Tribe or the Flandreau City Police Department, no such express delegation was required. *Id.* The contract needed only to provide for law enforcement services by the City on Tribal lands. *Id.*

Continuing with the threshold question, the Eighth Circuit next considered whether the Flandreau City police officer's lack of federal training meant he could not qualify as a federal

officer. *Id.* The Court held it did not. *Id.* Because the purpose of § 111 is to protect both federal functions and federal officers, as long as the officer "was undoubtedly performing a federal function—the provision of law enforcement services on Indian land—at the time of the incident," he would be "entitled to federal officer status as a threshold matter." *Id.* at 491.

Mindful of the Supreme Court's admonishment in *United States v. Feola*, 420 U.S. 671, 677 n.9 (1975), that the purpose of § 111 is "to protect the integrity of federal functions," as well as "the safety of federal officers," the Court turns its attention to the terms of the Intergovernmental Service Agreement and the statutory and regulatory authority authorizing the USMS to contract for the custody, care, and safekeeping of federal prisoners.

Title 18 U.S.C. § 4013 authorizes the United States Attorney General to pay non-federal institutions housing federal detainees for the clothing, medical care, guard services, housing, care, and security of those individuals. 18 U.S.C. § 4013(a). USMS Policy Directive 9.2E.2 authorizes the USMS to contract with local detention facilities for the housing of federal prisoners, pursuant to the USMS/Intergovernmental Agreement Program. (Gov't Ex. 2 at 1.) The Intergovernmental Agreement Program is defined as "a formal written agreement between the USMS and a local or state government for the housing, care and safekeeping of federal prisoners in exchange for payment by the USMS." (Gov't Ex. 3 at 1.) The Intergovernmental Services Agreement between the USMS and Sherburne County Jail provides "for the housing, safekeeping and subsistence of adult male and female federal prisoners including transport and guard services." (Gov't Ex. 1 at 1.) The Sherburne County Jail is charged with specific duties and obligations such as providing medical services, supervision, meals, and transportation and escort guard services. (*Id.* at 9-11.) The Sherburne County Jail also promises to allow the USMS to inspect the facility periodically and to examine the jail's records. (*Id.* at 7, 9.) The USMS

requires the Sherburne County Jail to treat all federal prisoners as medium/maximum security inmates, not to contract out any services without prior approval, and to obtain approval before removing a federal prisoner from the facility. (*Id.* at 2-3.)

The Court finds that the Intergovernmental Services Agreement between the USMS and the Sherburne County Jail is sufficient to authorize Sherburne County Jail corrections officers to assist the USMS in performing the federal functions of providing housing, safekeeping, and subsistence for federal prisoners. Therefore, the Government has satisfied its threshold burden to demonstrate that a corrections officer in Overlie and Kipka's position qualifies as person assisting a federal officer or employee, as contemplated by § 1114.

Courts have applied § 1114's "assistance" language much more broadly than the Court does here today. For example, leading to the Second Circuit's decision in *United States v. Matthews*, the USMS was charged with running a hotel during the pendency of civil forfeiture proceedings. 106 F.3d 1092, 1094 (2d Cir. 1997). The USMS contracted for the daily management and maintenance of the hotel with P&L Management and Consulting ("P&L"). *Id.* About a year later, a hotel tenant assaulted a handyman employed by P&L who was installing drywall in the tenant's room. *Id.* The tenant was charged with and convicted of assaulting an individual employed to assist the USMS, pursuant to §§ 111 and 1114. *Id.* On appeal, the tenant argued that the handyman had not been employed to assist the USMS and had not been engaged in law enforcement-type duties at the time of the assault. *Id.* While a handyman repairing sheetrock is not "intuitively associated with these statutory protections for federal officers," the court found that this particular handyman "was 'employed to assist' the Marshals Service in its performance of official 'law enforcement activities.'" *Id.* at 1096. The "assistance" language of "§ 1114 is not restricted to direct employees of the Marshals Service." *Id.* The term also includes

"persons working for public or private entities that furnish services to the Marshals under contract." *Id.*

Similarly, in *United States v. Schaffer*, a federal prisoner was transferred to a non-governmental hospital under contract with the Bureau of Prisons. 664 F.2d 824, 825 (11th Cir. 1981). Although he was transported to the hospital by the USMS, he was turned over to a private employee of the hospital. *Id.* The defendant struck the employee with a metal object and fled; he was later convicted of assault under § 111 and § 1114. *Id.* The Eleventh Circuit construed the phrase "employed to assist" broadly to include the employees of the private facility under contract, with no discussion of the employee's particular duties or the contractual terms. *Id.*

Defendants criticize the Government's reliance on older cases such as *Matthews* and *Schaffer*, arguing that the 1996 revision of § 1114's language from "person employed to assist" to "assisting such an officer or employee" renders the cases inapposite. (Defs.' Mem. Supp. Mots. Dismiss at 16, ECF No. 84.) The Court rejects this premise. First, *Matthews*, a 1997 case, was decided after the 1996 amendment. Second, the phrase "employed to assist" is inherently *more* narrow, not less, than the phrase "assisting." Thus, if anything, the amendment expanded, not contracted, the statute's reach. Third, while the cases are illustrative of the broad net Congress intended to cast by enacting § 1114, there are several more recent and more analogous cases in accord with the Court's findings.

The facts of this case are strikingly similar to those of *United States v. Ama*, 97 F. App'x 900 (10th Cir. 2004). There, the Tenth Circuit held that a county corrections officer was assisting a federal officer, within the meaning of § 111 and § 1114 when he was assaulted by a federal prisoner at the county detention facility, by virtue of the services agreement between the county facility and the USMS. *Id.* at 902-03. Awaiting designation to a federal facility, the prisoner was

confined at the county facility pursuant to a contract between the county and the USMS "to provide for the 'custody, care and safekeeping of federal prisoners' in exchange for monetary compensation." *Id.* at 900-01. The prisoner got into a fight with another inmate, and when a guard intervened, the prisoner struck him unconscious. *Id.* at 901. The court framed the threshold question as whether the guard was performing his duties "for the purpose of assisting a federal officer." *Id.* at 901-02. Invoking *Feola*'s edict that § 111 protects "both federal officers and federal functions," 420 U.S. at 679, the *Ama* court found that the guard "was acting pursuant to a contract to provide assistance to the United States Marshal, whose official duties include housing prisoners awaiting federal trial. Thus, he was performing the same duties and functions that a federal officer would perform," 97 F. App'x at 902. The court summarily rejected the defendant's challenges based on the source of the guard's pay, the lack of a specific federal officer whom the guard was assisting, the absence of cross-deputization, and the fact that the guard was safeguarding both state and federal inmates in the same area. *Id.* In this case, Defendants have made similar arguments, and the Court rejects them as well. For the purpose of the threshold legal question before the Court, it is sufficient that an Intergovernmental Services Agreement was in place between the USMS and the Sherburne County Jail and provided for county corrections officers to assist in the performance of traditional USMS functions.

The Fifth Circuit reached a result similar to *Ama* in both *United States v. Jacquez-Beltran*, 326 F.3d 661 (5th Cir. 2003), and *United States v. Gardner*, 248 F. App'x 605 (5th Cir. 2007). In *Jacquez-Beltran*, a federal prisoner assaulted a private employee of the Corrections Corporation of America. 326 F.3d at 663. Based on the indictment's allegations that the guard was engaged in official duties assisting federal officers at the time of the assault and was assaulted because of those duties, and facts demonstrating that all private guards at the facility

assisted Bureau of Prisons employees, the court upheld the defendant's conviction under § 111 and § 1114. *Id.* The court rejected the notion that a federal officer had to be physically present with the victim as outside the plain language of the statute. *Id.*

In *Gardner*, the defendant was taken into USMS custody and hospitalized after violating his conditions of supervised release. 248 F. App'x at 606. He was guarded at the hospital by a private security firm under contract with the USMS. *Id.* During an escape attempt, the defendant assaulted one of the private security guards. *Id.* The court easily concluded that because the guard was under contract with the USMS, he met the criteria as a person assisting a federal officer. *Id.* at 608.

Defendants rely primarily on *United States v. Reed*, 375 F.3d 340 (5th Cir. 2004), and *United States v. Sapp*, 272 F. Supp. 2d 897, 907 (N.D. Cal. 2003), for their jurisdictional arguments. The factual distinctions between these cases and the present litigation, however, renders them inapplicable. *Reed* involved a suspect fleeing a bank robbery, who was pursued initially by a city police officer. 375 F.3d at 341. While the police officer was in pursuit, an FBI agent heard the robbery dispatch over the police radio and joined chase. *Id.* Meanwhile, the police officer had cornered the suspect, began chasing him on foot, and exchanged gunfire. *Id.* at 341-42. The suspect had already surrendered to the police officer before the FBI agent arrived. *Id.* at 342. The court determined that the police officer was not "assisting" the federal agent, because he was not providing supplemental help or auxiliary support. *Id.* at 344. Rather, it was the federal agent who was assisting the police officer. *Id.* at 344-45. Thus, the conviction under § 111 and § 1114 could not stand. *Id.* at 345. Contrary to Defendants' contention, the *Reed* court did not hold that a state actor had to be directly assisting a specific federal employee in order for § 1114 to apply.

The defendant in *Sapp* was convicted under § 1114 for attempting to kill local police officers who were attempting to apprehend him pursuant to a federal warrant. 272 F. Supp. 2d at 898-99. Despite the existence of the federal warrant, the apprehension involved no federal participation. *Id.* at 907. Federal agents were not even aware of the local police department's surveillance operations or plans. *Id.* at 907-08. Under these circumstances, the court found no assistance to a federal officer by the local officers. *Id.* at 910. Like *Reed*, *Sapp* did not involve an agreement between local and federal authorities providing for the performance of federal functions or assistance to federal authorities. Thus, Defendants' reliance on these cases is misplaced.

Defendants also urge the Court to adopt *Sapp*'s conclusion that the amendment of § 1114 in 1996 effectively superseded *Feola*'s determination of Congressional intent to protect both federal functions and federal officers. *See Sapp*, 272 F. Supp. 2d at 908-09. However, adopting this position would require the Court to ignore the Eighth Circuit's post-amendment decision in *Roy*, in which the court recognized and gave credence to *Feola*'s dual purpose discussion, *see Roy*, 408 F.3d at 490-91.

In finding that the Intergovernmental Services Agreement authorizes Sherburne County Jail corrections officers to assist the USMS in performing federal functions, and that a corrections officer in Overlie and Kipka's position qualifies as person assisting a federal officer or employee, the Court makes no comment on whether the evidence at trial will show that Overlie and Kipka were such officers and whether they were engaged in official duties at the time of the alleged assault. These are fact questions properly submitted to the jury.

### B. Vagueness and Overbreadth

Defendants argue that the term "assisting" in 18 U.S.C. § 1114 is vague and ambiguous, rendering the statute unconstitutional. Defendants fail to cite any authority for their position, and in fact, Defendants' own cases hold that the term "assisting," as used in § 1114, is unambiguous. *United States v. Reed*, 375 F.3d at 344 ("The meaning of the verb 'assist' is thus clear and uncontroverted: It means to provide supplemental help or support to another in carrying out some task of mutual involvement."); *Sapp*, 272 F. Supp. 2d at 906 (refusing to apply the rule of lenity because the defendant demonstrated no ambiguity in § 1114's language); *see also Murphy*, 35 F.3d at 145 ("The term 'assist' means 'to give support or aid.' . . . Application of the articulated legal precepts compels us to conclude that the challenged language is not ambiguous, and thus we use the plain meaning of the words comprising the challenged language to apply the statute."). Defendants have not demonstrated that § 1114 is vague or ambiguous, and their motion on this point should be denied.

Defendants next argue that the Government's interpretation of § 1114 is overbroad, submitting that under the Government's view, anyone who provides services connected to the incarceration of federal prisoners, such as deliverymen or utility companies, would be "assisting" the USMS. Again, Defendants cite no authority for their proposition. Furthermore, the Court is not faced with a situation in which the Government seeks to hold Defendants accountable for an assault on a deliveryman or utility worker, although *Matthews* and *Schaeffer* would certainly support that position. Here, Defendants are charged with assaulting two county corrections officers who were assisting the USMS in performing federal functions pursuant to an Intergovernmental Services Agreement. Defendants have not shown this application of § 1114 to be overbroad.

Defendants' final challenge to § 1114 is that the Government's interpretation of the statute renders 18 U.S.C. § 1121 superfluous. Section 1121 penalizes the killing of state and local officers by a prisoner if the prisoner is incarcerated for a federal crime. 18 U.S.C. § 1121(b)(1), (3). Once again, Defendants provide no authority for their position, and this argument was soundly rejected in *Sapp*, 272 F. Supp. 2d at 901-06. This Court likewise declines to adopt Defendants' argument.

Based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Robinson's Motion to Suppress February 8, 2013 Statements, Admissions, and Answers (ECF No. 47) be **DENIED**;

2.      Luedtke's Motion to Suppress Statements, Admissions, and Answers (ECF No. 55) be **DENIED AS MOOT**;

3.      Luedtke's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 56) be **DENIED AS MOOT**;

4.      Luedtke's Motion to Dismiss for Lack of Jurisdiction (ECF No. 57) be **DENIED**;

5.      Goodwin's Motion to Suppress Statements (ECF No. 60) be **DENIED**;

6.      Goodwin's Motion to Suppress Physical Evidence (ECF No. 61) be **DENIED AS MOOT**;

7.      Goodwin's Motion to Sever Defendant (ECF No. 70) be **DENIED**;

8.      Robinson's Motion to Dismiss for Lack of Jurisdiction (ECF No. 82) be **DENIED**; and

9.       Goodwin's Motion to Dismiss (ECF No. 83) be **DENIED**.


Dated: June 5, 2013

*s/ Jeanne J. Graham*
JEANNE J. GRAHAM
United States Magistrate Judge

**NOTICE**

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **June 20, 2013**. A party may respond to the objections within fourteen days of the objections being filed. Any objections or responses filed under this rule shall not exceed 3,500 words. The district judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit. Unless the parties are prepared to stipulate that the district judge is not required to review a transcript of the hearing in order to resolve the objections, the party making the objections shall timely order and cause to be filed within fourteen days a complete transcript of the hearing.